**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

SUE ANN WILLOUGHBY            PLAINTIFF

V.         NO. 4:08CV00161 JTR

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration            DEFENDANT

**MEMORANDUM AND ORDER**

**I. Introduction**

Plaintiff, Sue Ann Willoughby, has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). Both parties have filed Appeal Briefs (docket entries #10 and #11), and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Long v. Chater,* 108, F.3d 185, 187 (8th Cir. 1997); *see also*, 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion,[1] "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." *Haley v.*

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

*Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On April 18, 2005, Plaintiff filed an application for DIB, alleging disability since January 1, 2001, due to mental health problems, including depression and mood swings. (Tr. 56, 73-81.) After Plaintiff's claim was denied at the initial and reconsideration levels, she requested a hearing before an Administrative Law Judge ("ALJ"). On January 18, 2007, the ALJ conducted an administrative hearing, where Plaintiff, her husband, and a vocational expert ("VE") testified. (Tr. 183-214.)

At the time of the administrative hearing, Plaintiff was 38-years old and had obtained a GED. (Tr. 193.) Her past relevant work included jobs as a dishwasher, an assembler, a housekeeper, a cashier, and a waitress. (Tr. 209-10.)

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process. Step 1 involves a determination of whether the claimant is involved in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(I) (2005), §416.920. If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience. *Id.*, § 404.1520(b), § 416.920.

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has an impairment or combination of impairments which significantly limits claimant's ability to perform basic work activities, a "severe" impairment. *Id.*, § 404.1520(4)(ii), § 416.920. If not, benefits are denied. *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, §

404.1520(a)(iii), § 416.920.[2]  If so, and the duration requirement is met, benefits are awarded.  *Id.*

Step 4 involves a determination of whether the claimant has sufficient RFC, despite the impairment(s), to perform the physical and mental demands of past relevant work.  *Id.*, § 404.1520(4)(iv), § 416.920.  If so, benefits are denied.  *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience.  *Id.*, § 404.1520(4)(v), § 416.920.  If so, benefits are denied; if not, benefits are awarded.  *Id.*

In his April 27, 2007 decision, the ALJ found that Plaintiff: (1) met the Act's insured status requirements; (2) had not engaged in substantial gainful activity since the alleged onset date; (3) had "severe" impairments consisting of bipolar disorder, depression, and anger; (4) did not have an impairment or combination of impairments meeting a Listing; (5) was not entirely credible; (6) had the RFC to perform work at all exertional levels in a setting where interpersonal contact was incidental to the work performed, the complexity of tasks was learned and performed by rote, with few variables and little judgment, and simple supervision, and (7) could return to her past relevant work as it was performed in the national economy.  (Tr. 15-20.)  Thus, the ALJ concluded that Plaintiff was not disabled.  (Tr. 20.)

On February 1, 2008, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner.  (Tr. 3-5.)  Plaintiff then filed her Complaint appealing that decision to this Court.  (Docket entry #2.)

---

[2]If the claimant's impairments do not meet or equal a Listing, then the ALJ must determine the claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence.  *Id.*, § 404.1520(e).  This RFC is then used by the ALJ in his analysis at Steps 4 or 5.  *Id.*

## II. Analysis

In Plaintiff's Appeal Brief (docket entry #10), she argues that the ALJ erred: (1) in discounting her credibility; (2) in assessing her RFC; and (3) in his Step 4 analysis. For the reasons discussed below, the Court concludes that Plaintiff's second argument has merit. However, before addressing the merits of this argument, the Court will briefly review the medical evidence.

**A.     Hearing Testimony and Medical Evidence**

Plaintiff testified that she had been treated for what was eventually diagnosed as bipolar disorder since about 2001. (Tr. 189-90.) Plaintiff described having major ups and downs, and feelings of "real bad" depression. (Tr. 190.)

Plaintiff took Abilify (an antipsychotic medication), which made her nervous and gave her "racing thoughts." (Tr. 190.) Plaintiff also took Provigil (a stimulant) to help her stay awake during the day, and Seroquel (an antipsychotic medication) to help her "come down" following a manic episode. (Tr. 190-91.) She had a continuous cycle of high and low mood swings. (Tr. 192.)

According to Plaintiff, she could not keep jobs due to changes in her mood. As an example, she lost an assembly line job at Bosch Skill after an episode of uncontrollable crying. (Tr. 194.) She would try to find work at times when she felt better, but "it just never worked out" because she would get "all depressed and everything again." (Tr. 201.) Plaintiff was easily angered and could fly off the handle at a "little thing." (Tr. 203.)

Plaintiff's husband, Roger Willoughby, testified that she had radical mood swings. Sometimes she would throw things at him or lock herself in a room for hours. (Tr. 206.) While medication improved Plaintiff's mood, it was still difficult to be around her at times. (Tr. 207.)

On August 19, 2002, Plaintiff was first seen at the North Arkansas Human Services System.

(Tr. 170.) Other than an intake form from this clinic, there are no treatment notes in the administrative record indicating any diagnosis or treatment. On January 31, 2003, Plaintiff was diagnosed with major depressive disorder by Dr. Goatcher, and was assessed to have a GAF of 45, with a past highest GAF of 65.[3] (Tr. 163-67.) Her main problems were identified as depression, anger outbursts, and medication management. Plaintiff was continued on Paxil.

On March 13, 2003, Plaintiff's GAF was 51, and she reported doing better since taking her medication. (Tr. 160.) On April 14, 2003, Plaintiff reported self-reducing her medication dose to "make it last" and "getting angry again." (Tr. 159.) Plaintiff's GAF was 49. (Tr. 159.) On July 21, 2003, Plaintiff reported that things had been "awful" and that she had lost a job due to lack of sleep. (Tr. 155.) Dr. Goatcher assessed Plaintiff to have a GAF of 55 and changed her medication to Lexapro. (Tr. 156.)

On August 4, 2003, Plaintiff reported that the Lexapro did not work. Dr. Goatcher assessed Plaintiff to have a GAF of 45, discontinued the Lexapro, and started her on Zoloft. (Tr.154.) On September 15, 2003, Dr. Goatcher indicated that Plaintiff possibly had bipolar disorder, and added Trileptal (a mood stabilizer) to Plaintiff's medication regimen. (Tr. 150.) Plaintiff's GAF was 45. (Tr. 150.) On September 27, 2003, Plaintiff reported being too drowsy on the Trileptal, and Dr. Goatcher added Depakote to Plaintiff's medication regimen. (Tr. 149.) Plaintiff's GAF was 45. (Tr. 149.) On October 13, 2003, Plaintiff reported feeling much better and was assessed to have a GAF of 55. (Tr. 148.)

In February of 2004, Plaintiff reported that she was out of medication and reported sleeping too much. Dr. Goatcher assessed Plaintiff's GAF as 50. (Tr. 146.) On April 5, 2004, Dr. Goatcher

---

[3]Dr. Goatcher is a medical doctor but it is unclear whether he or she is a psychiatrist.

indicated that Plaintiff needed group therapy for depression. (Tr. 144.) On July 26, 2004, Plaintiff reported doing well on a combination of Paxil and Lamictal. (Tr. 140.) On December 13, 2004, Plaintiff reported the return of mood swings, and she was prescribed Depakote. (Tr. 133.)

On April 11, 2005, Plaintiff was started on Lithium. (Tr. 128.) On May 9, 2005, Plaintiff reported that the Lithium was not working and it was replaced with Abilify. On September 12, 2005, Plaintiff reported that she was not angry or irritable, but that she was not "totally out of her depression." (Tr. 118.)

On June 29, 2005, Plaintiff underwent a consultative psychological examination from psychologist Sam Boyd. (Tr. 91-97.) Dr. Boyd diagnosed Plaintiff with bipolar disorder and assessed her current GAF as 50, with a highest past year GAF of 50. (Tr. 95.) Dr. Boyd considered it unlikely that Plaintiff would show significant improvement during the next year based on the "chronicity and severity" of her disorder. (Tr. 95.) In evaluating Plaintiff's adaptative functioning, Dr. Boyd noted that she: (1) had no limitations in communication, (2) showed an unusual degree of social withdrawal, based on her report of having no friends; (3) had no problems with concentration, persistence, and pace; (4) did not have adaptive deficits in two or more areas of adaptive behavior; and (5) was not malingering. (Tr. 96.)

**B.     The ALJ's RFC Analysis**

According to Plaintiff, the ALJ erred in his RFC analysis because he did not give controlling weight to the GAF scores from her treating physician, Dr. Goatcher. (*Pltff's App. Brf.* at 8-10.) As indicated earlier, Dr. Goatcher assessed Plaintiff to have a GAF of between 45 and 55.[4] Plaintiff

---

[4]A GAF score between 41 and 50 indicates "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, inability to keep a job)." *See* DSM-IV-TR at 34. A GAF

argues, among other things, that the ALJ ignored these GAF scores, which supported her claim that she had serious limitations in occupational/social functioning.

In assessing Plaintiff's mental RFC, the ALJ found that Plaintiff's psychological problems limited her to unskilled work, *i.e.*, work where interpersonal contact was incidental to the work performed, and the complexity of tasks was learned and performed by rote, with few variables and little judgment, requiring simple supervision. While the ALJ's decision contains a general recitation of Plaintiff's treatment history, it contains no discussion of Plaintiff's multiple GAF scores, many of which placed her in the range of having serious impairments in social and/or occupational functioning.

The Commissioner dismisses Dr. Goatcher's GAF scores because they "are inconsistent with [her] findings on mental status examination." Citing various findings in Dr. Goatcher's medical records, the Commissioner contends that the "ALJ could properly discount Dr. Goatcher's subjective scores because they are internally inconsistent with Dr. Goatcher's findings on examination." *(Dft's App. Brf.* at 10.)

An ALJ is not required to discuss all of the evidence. Similarly, the ALJ's failure to cite specific evidence does not necessarily indicate that it was not considered. However, the Eighth Circuit has recognized that GAF scores may be relevant evidence. *See Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (noting that claimant was discharged from the hospital with a GAF score of 50, which reflected "serious limitations in the patient's general ability to perform basic tasks of daily life"); *Wilson v. Astrue*, 493 F.3d 965, 968 (8th Cir. 2007) (GAF and IQ scores were

---

from 51 to 60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *Id.*

"certainly pieces of the hypothetical puzzle necessary to gain an accurate overall assessment" of the claimant's functioning); *Duncan v. Barnhart*, 368 F.3d 820, 824 (8th Cir. 2004) (noting that claimant's GAF score of 50 indicated "serious symptoms or impairments").

In this case, Dr. Goatcher treated Plaintiff over an extended period of time, and her consistent GAF assessments in the range from 45-55 were corroborated by the consultative psychologcial examiner, who assessed Plaintiff to have a GAF of 50. While there *may* be valid reasons for discounting Plaintiff's GAF scores, the ALJ's decision is conspicuous in failing to contain *any discussion* of this evidence in assessing Plaintiff's RFC.[5] Under these circumstances, the Court concludes that substantial evidence does not support the ALJ's RFC assessment.

### III. Conclusion

The Court concludes that substantial evidence does not support the ALJ's RFC assessment. On remand, the ALJ should carefully update the medical record and ensure that he obtains and considers all of the medical evidence to support his RFC assessment and document his application of the psychiatric review technique in his decision.

IT IS THEREFORE ORDERED THAT the Commissioner's decision is reversed and this

---

[5]The ALJ's omission is compounded by his failure to include any psychiatric review technique analysis in his decision. The ALJ's written decision: (1) "must incorporate the pertinent findings and conclusions based on the technique"; (2) "must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)"; and (3) "must include a specific finding as to the degree of limitation in each of the functional areas described in [20 C.F.R. § 404.1520a(c)]." 20 C.F.R. § 404.1520a(e)(2). The technique is not a mere formality or technicality. The regulations expressly acknowledge that the technique aids the Commissioner in: (1) identifying the need for additional evidence to determine the severity of mental impairments; (2) the consideration and evaluation of functional consequences of mental impairments; and (3) the organization and presentation of the Commissioner's findings "in a clear, concise, and consistent manner." 20 C.F.R. § 404.1520a(a)(1)-(3).

matter is remanded to the Commissioner for further proceedings pursuant to "sentence four," within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 23rd day of February, 2009.

_____
UNITED STATES MAGISTRATE JUDGE